# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| STEVEN SIMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0841-KSJM |
| | ) | |
| BROOKFIELD ASSET MANAGEMENT | ) | |
| INC., BCP IV GRAFTECH HOLDINGS LP, | ) | |
| BPE IV (NON-CDN) GP LP, BROOKFIELD | ) | |
| CAPITAL PARTNERS LTD., BCP GP | ) | |
| LIMITED, DENIS TURCOTTE, JEFFREY | ) | |
| DUTTON, DAVID GREGORY, DAVID | ) | |
| RINTOUL, ANTHONY TACCONE, | ) | |
| MICHEL DUMAS, BRIAN ACTON, | ) | |
| CATHERINE CLEGG, LESLIE DUNN, and | ) | |
| GRAFTECH INTERNATIONAL LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 4, 2021
Date Decided: January 21, 2021

Kevin H. Davenport, Samuel L. Closic, Eric J. Juray, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Brian J. Robbins, Gregory Del Gaizo, Stephen J. Oddo, Eric M. Carrino, ROBBINS LLP, San Diego, California; *Attorneys for Plaintiff Steven Simons.*

Bradley R. Aronstam, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Geoffrey J. Ritts, JONES DAY, Cleveland, Ohio; Marjorie P. Duffy, JONES DAY, Columbus, Ohio; *Attorneys for Defendants David Rintoul, Anthony Taccone, Michel Dumas, Brian Acton, Catherine Clegg, Leslie Dunn, and GrafTech International Ltd.*

Blake Rohrbacher, Alexander M. Krischik, Andrew L. Milam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Lawrence Portnoy, DAVIS POLK & WARDWELL LLP, New York, New York; *Attorneys for Defendants Brookfield Asset Management Inc., BCP IV Graftech Holdings LP, BPE IV (Non-Cdn) GP LP, Brookfield Capital Partners Ltd., BCP GP Limited, Denis Turcotte, Jeffrey Dutton, and David Gregory.*

**McCORMICK, C.**

In 2019, GrafTech International, Ltd. ("GrafTech" or the "Company") repurchased shares of stock from its controlling stockholder, Brookfield Asset Management, Inc. ("Brookfield"). The repurchase price was set by reference to a separate, arm's-length transaction between Brookfield and a third party. The plaintiff stockholder alleges that the repurchase price was not entirely fair to GrafTech.

Under the recent Delaware Supreme Court decision *Brookfield Asset Management, Inc. v. Rosson*,[1] the plaintiff's claim is solely derivative and thus subject to the demand requirement. Because the plaintiff did not make a pre-suit demand, the plaintiff must allege particularized facts demonstrating that demand would have been futile.

The demand futility analysis requires that this court determine whether the majority of the directors on GrafTech's board at the time the complaint was filed were capable of impartially considering a litigation demand. This requires the court to assess each director's independence from Brookfield. To improve his odds, the plaintiff seeks to exclude from the head-counting analysis an indisputably independent ninth director who was added to the board after the share repurchase. The plaintiff argues that the addition of the ninth director violated a stockholder agreement.

This decision finds that the ninth director's appointment was valid. As a consequence, the majority of the board was capable of impartially considering a litigation demand. The defendants' motion to dismiss is granted.

---

[1] 261 A.3d 1251 (Del. 2021).

# I.       FACTUAL BACKGROUND

The facts are drawn from Plaintiff's Amended Verified Individual, Class Action and Derivative Complaint (the "Amended Complaint").[2]

## A.       Brookfield Controls GrafTech.

GrafTech is a publicly traded Delaware corporation that manufactures graphite electrode products essential to the production of electric arc furnace steel and other metals.

Brookfield, an asset management company, acquired GrafTech in 2015 and took GrafTech public in April 2018. Following the IPO, Brookfield continued to own a majority of GrafTech's common stock.

## B.       GrafTech's Board Of Directors

In connection with the IPO, GrafTech amended its Certificate of Incorporation (the "Certificate") and Brookfield executed a Stockholder Rights Agreement (the "Stockholder Agreement"). The Certificate and the Stockholder Agreement each contain provisions concerning the size and composition of GrafTech's Board of Directors (the "Board").

The Certificate established a classified Board and grants Brookfield the ability to remove directors with or without cause until Brookfield ceases to hold 50% or more of GrafTech common stock.[3] The Certificate sets the minimum number of directors at three and maximum at eleven, permitting the Board to determine "from time to time" the "exact

---

[2] *See* C.A. No. 2020-0841-KSJM, Docket ("Dkt.") 26, Pl.'s Am. Verified Individual, Class Action and Deriv. Compl. ("Am. Compl.").

[3] Dkt. 33, Ex. 14, Certificate art. VI, § 2. If Brookfield owns less than 50% of outstanding common stock, then directors can only be removed for cause and by a 66 2/3% vote of outstanding common stock. *Id.*

2

number of directors."[4]  It further provides that the Board's determination of the "exact number of directors" is "subject to" the Stockholder Agreement.[5]

Section 1.1(c) of the Stockholder Agreement grants Brookfield the right to "designate for nomination the higher of 37.5% of the total number of directors or three (3) directors (each a 'Designated Director')."[6]

Section 1.1(f)(i) of the Stockholder Agreement provides that

> [f]or so long as the Majority Approved Holders have the right to designate directors for nomination pursuant to Section 1.1(c):
>
> (i) the Company or the Board shall (i) to the extent necessary cause the total number of directors constituting the Board to be fixed at a number sufficient to permit such persons to be added as members of the Board.[7]

Section 1.1(a) of the Stockholder Agreement further provides that

> [p]rior to the IPO Closing, [Brookfield] and the Company shall take all Necessary Action to cause the total number of directors constituting [the Board] to be fixed at seven (7) directors as of the IPO Closing, (i) three (3) of who shall be Designated Directors, (ii) three (3) of whom shall each satisfy the requirements to qualify as an Independent Director . . . and (iii) one (1) of whom shall be the Chief Executive Officer of the Company.  [Brookfield] and the Company shall take all necessary Action to cause the Chairman of the Board . . . to be chosen from among the Designated Directors.[8]

---

[4] Certificate § 1(a).

[5] *Id.*

[6] Dkt. 33, Ex. 2, Stockholder Rights Agreement dated Apr. 23, 2018 ("S'holder Agr."), art. I, § 1.1(c).

[7] *Id.* art. I, § 1.1(f)(i).

[8] *Id.* art. I, § 1.1(a).

3

Section 1.1(e) of the Stockholder Agreement provides that, within a year of the IPO, the parties were to expand the board to eight seats and fill the new seat with an Independent Director.

Pursuant to these provisions, GrafTech's seven-person Board at the time of the IPO comprised: Brookfield's three Designated Directors, Denis Turcotte, Jeffrey Dutton, and Ron Bloom; three outside directors, Anthony Taccone, Michel Dumas, and Brian Acton; and GrafTech's President and CEO, David Rintoul. David Gregory later replaced Bloom as a Designated Director.

Within one year of the IPO, the Board expanded to include an eighth director and Catherine Clegg was appointed to fill that position. Clegg was recommended to the Board by Bloom, who was also Brookfield's Managing Partner.

**C.     Events Preceding The Challenged Transactions**

Brookfield took GrafTech public at $15.00 per share. Immediately before the IPO, Brookfield received $2 billion in dividends by increasing GrafTech's debt, including through the $750 million Brookfield Note dividend. Immediately after the IPO, Brookfield caused GrafTech to prepay the Brookfield Note by borrowing an additional $750 million on its Senior Secured Credit Facility.

Shortly after that, Brookfield decided to further liquidate portions of its GrafTech stake. On August 6, 2018, GrafTech filed a draft registration statement for Brookfield to sell 20 million shares. GrafTech's stock price closed at $21.98. After the markets closed on August 8, 2020, the registration statement became final and disclosed that Brookfield sold 20 million shares at $20.00 per share with $0.75 per share in underwriting fees.

GrafTech repurchased 11.7 million shares from Brookfield for a total cost of $225 million and an effective price of $19.25 per share. Following the repurchase, GrafTech's stock price immediately declined to $19.50, down 11.4%.

Several months later, Brookfield tried to sell more shares through another registered offering. At a March 1, 2019 Board meeting, Gregory, who was not a director at the time, presented Brookfield's plan to sell more stock. The Board "determined that the Secondary Offering [was] advisable and in the best interests of the Corporation and its stockholders" and approved the plan.[9]

GrafTech filed a Form S-1 Registration Statement for Brookfield to sell up to 20,125,000 shares on March 4, 2019. The Registration Statement stated that the average of the high and low trading prices on March 1, 2019 was $14.36. GrafTech's stock price declined upon the announcement from $14.23 on March 4 to $11.61 on March 6, a decrease of 18.4%. On March 27, 2019, GrafTech withdrew the Registration Statement for Brookfield "due to market conditions."[10] Management privately admitted that Brookfield caused the 18.4% stock price decline. Management also privately admitted that the attempt to dump another 20 million shares resulted in the stock price now being "capped at around $14 to $15 per share."[11]

During a July 30, 2019 meeting, the Board approved a share repurchase plan to boost GrafTech's stock price (the "Public Repurchase Plan"). GrafTech would repurchase

---

[9] Am. Compl. ¶ 41.

[10] *Id.* ¶ 43.

[11] *Id.* ¶ 44.

up to $100 million in shares, with specific share amounts dependent on GrafTech's stock price and average trading volume. The Board directed management that "no shares shall be repurchased . . . at a price in excess of $11.00 per share."[12] The lower the stock price, the more would be repurchased.

The purpose of the Public Repurchase Plan was to support GrafTech's stock price and return capital to public stockholders. On July 31, 2019, GrafTech announced the Public Repurchase Plan. That same day, the stock price rose from $11.19 at open to $11.45 at closing. Within a week, however, the stock price had declined to $10.59.

In the third quarter of 2019, GrafTech purchased only 879,134 public shares for $9.484 million, at an average price of $10.79; in October, GrafTech purchased 125,551 shares for $1.384 million, at an average price of $11.01; in November and December, GrafTech did not purchase shares. In total, the Public Repurchase Plan involved purchasing 1,004,685 shares for $10.868 million.

**D.    The Challenged Transactions**

During the November 6, 2019 meeting, the Board was informed that the Company's forecasted revenue was $200 million and that EBITDA was $93 million, which were below expectations. Operating and free cash flow were both $40 million and $43 million below expectations respectively. Over the course of November 2019, however, the Company's stock price increased from $11.74 to $14.84.

---

[12] *Id.* ¶ 47.

Brookfield became aware of the disappointing financial results through its representatives on GrafTech's Board. Brookfield proposed a repurchase and block trade to take effect before the bad news became public.

On November 27, 2019, Turcotte called for a Special Board Meeting to consider equity transactions. At the meeting, Turcotte unveiled Brookfield's two-step plan whereby Brookfield would sell GrafTech stock in a block trade and a share repurchase by GrafTech.

A Capital Structure Management report detailed the plan. Brookfield would sell up to 11 million shares of GrafTech to a broker-dealer under a Rule 144 secondary block trade (the "Block Trade"). GrafTech then would repurchase up to $250 million worth of GrafTech common stock from Brookfield at the price per share paid to the broker-dealer in the Block Trade (the "Share Repurchase" and together with the Block Trade, the "Challenged Transactions"). The Board expected that the discount rate on the Share Repurchase would be between 2% and 10% with an average discount rate of 4%. Additionally, the Share Repurchase was contingent upon Brookfield selling a minimum of $50 million worth of GrafTech common stock in the Block Trade.

During a Special Board Meeting held on December 3, 2019, the Board delegated to the Audit Committee—comprised of Dumas, Acton, and Taccone—"the full authority of the Board" to make decisions about the Share Repurchase, including whether to conduct the Share Repurchase and, if so, on what terms.[13]

---

[13] Dkt. 33, Ex. 9 at 3.

7

Dumas and Taccone convened an Audit Committee meeting later that day. Acton was not present at that meeting or the Board meeting that occurred earlier that day. During the meeting, Dumas and Taccone approved the Share Repurchase at a price to be set by reference to the Block Trade. This approval relied on projections of available cash flow, a certificate of the Company's Chief Financial Officer regarding the fair value of the Company's assets and liabilities (which relied on a solvency opinion from a financial advisory firm), and the Company's audited financial statements for 2018 and unaudited financial statements for the first three quarters of 2019, among other things. The materials provided to the Audit Committee had no specifics on the Block Trade.

### E. The Company Announces The Challenged Transactions.

On December 5, 2019, before the stock market opened, the Company announced the Block Trade and Share Repurchase in a press release. As described in the press release, Brookfield "launched a Rule 144 secondary block trade to sell 11.18 million shares of the Company's common stock to Morgan Stanley."[14] Then, "[s]ubject to the completion of the block trade, the Company will repurchase from the selling stockholder $250,000,000 of common stock at a per share price equal to the price per share payable by the broker-dealer in the block trade."[15]

The press release explained the Share Repurchase in terms of the Company's previously disclosed capital allocation strategy, noting that the Share Repurchase was

---

[14] *Id.* ¶ 74; Dkt. 33, Ex. 13, Form 8-K dated Dec. 9, 2019 ("Form 8-K") at Ex. 99.1.

[15] Form 8-K at Ex. 99.1.

"consistent with management's stated intent regarding potential uses of cash flow," "in-line with GrafTech's capital allocation strategy," and "a tax-efficient and accretive use of cash."[16] The Share Repurchase, which GrafTech funded with cash on hand, was conditioned on the closing of the Block Trade, but the Block Trade was not conditioned on the completion of the Share Repurchase.

Ultimately, Brookfield sold 11.2 million shares of GrafTech stock to Morgan Stanley at $13.125 per share, and the Company repurchased $250 million of GrafTech stock (about 19.05 million shares) at the same per-share price.

After the Challenged Transactions were announced, the price of GrafTech stock, which had closed at $13.93 on December 4, 2019, declined to $12.63 on December 5, 2019.

On February 6, 2020, GrafTech announced disappointing financial results and the trading price of GrafTech stock decreased by over 10%.

**F.      Plaintiff Makes A Section 220 Demand.**

Plaintiff has owned GrafTech stock since October 17, 2018. In February 2020, Plaintiff sent a Section 220 demand to the Company. In response, the Company produced 839 pages of documents in late April and early May 2020.

**G.      The Board Adds A Ninth Seat And Appoints An Independent Director.**

On August 5, 2020, the Board determined to expand from eight to nine seats and filled the vacancy with an Independent Director, Leslie Dunn.

---

[16] *Id.*

## H. This Litigation

Plaintiff filed this lawsuit on September 30, 2020. In response to Defendants' initial motions to dismiss, Plaintiff filed the Amended Complaint on February 5, 2021.[17] The Amended Complaint contains three counts.

In Count I, Plaintiff asserts a direct claim challenging the Share Repurchase.[18]

In Count II, Plaintiff asserts a derivative claim challenging the Share Repurchase.[19]

In Count III, Plaintiff challenges the appointment of director Dunn.[20]

Defendants renewed their motions to dismiss on March 22, 2021.[21] The parties completed briefing on May 27, 2021.[22]

On September 20, 2021, the Delaware Supreme Court issued *Brookfield Asset Management., Inc. v. Rosson*, overruling *Gentile v. Rossette* and clarifying the direct versus derivative analysis.[23] In response, Plaintiff withdrew Count I of the Amended Complaint.[24]

On October 4, 2021, the court heard oral arguments concerning Defendants' motions to dismiss the remaining counts.[25]

---

[17] *See generally* Am. Compl.

[18] *Id.* ¶¶ 120–24.

[19] *Id.* ¶¶ 125–28.

[20] *Id.* ¶¶ 129–39.

[21] Dkt. 32 ("Defs.' Opening Br").

[22] Dkt. 35 ("Pl.'s Ans. Br."); Dkt. 37 ("Defs.' Reply Br.").

[23] 906 A.2d 91 (Del. 2006), *overruled by*, 261 A.3d 1251 (Del. 2021).

[24] Dkt. 42, Letter to Ct. from Pl.'s Counsel ("In light of [the *Brookfield*] ruling, Plaintiff does not intend to press his claims under Count I of the Amended Complaint.").

[25] Dkt. 46, Oral Arg. Tr.

## II. LEGAL ANALYSIS

Defendants have moved to dismiss Count III under Rule 12(b)(6) for failure to state a claim and Count II under Rule 23.1 for failure to plead demand futility. This decision addresses Defendants' arguments in that order.

### A. Count III Fails To State A Claim.

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[26] On a Rule 12(b)(6) motion, the court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[27] The court "is not, however, required to accept as true conclusory allegations without specific supporting factual allegations."[28] The court draws "all reasonable inferences in favor of the plaintiff, and den[ies] the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[29]

In Count III, Plaintiff contends Defendants violated Section 1.1(c) of the Certificate and Stockholder Agreement by expanding the Board from eight to nine directors and appointing an Independent Director instead of a Brookfield Designated Director to fill the

---

[26] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[27] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[28] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (internal quotation marks omitted).

[29] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor*, 812 A.2d at 896–97).

vacancy. In the alternative, Plaintiff claims that the directors breached their fiduciary duties by filling the ninth seat with an Independent Director.

Count III fails to state a claim because the Certificate and Stockholder Agreement allowed for the expansion of the Board and did not require Brookfield to designate the ninth director. Also, it is not reasonably conceivable that the directors breached their fiduciary obligations by appointing a concededly independent and disinterested person to fill the vacant position.

### 1. The Certificate And Stockholder Agreement Permitted The Board's Expansion.

According to Plaintiff, Dunn's appointment was invalid because the Stockholder Agreement, in operation with the Certificate, "sets the exact size of the Board" and "does not authorize the Board to increase its size beyond eight members."[30] A close examination of these documents reveals the error of this argument.

The Certificate authorizes the Board to have "up to" eleven directors.[31] It authorizes the Board to set the "exact number of directors" "from time to time" within that eleven-member ceiling, albeit "[s]ubject to" the Stockholder Agreement.[32]

The Stockholder Agreement does not expressly restrict the Board from expanding up to the eleven-member cap established by the Certificate. Section 1.1(a) of the

---

[30] Am. Compl. ¶¶ 131–32.

[31] Certificate art. VI, § 1(a) ("[T]he Corporation shall be managed by or under the direction of the Board consisting of not fewer than three individuals, nor more than eleven individuals").

[32] *Id.*

12

Stockholder Agreement required that the Board have seven members as of the close of the Company's IPO in April 2018.[33] Section 1.1(b) required the Board to expand to eight members no later than April 2019, the first anniversary of the IPO.[34] Once the Board reached eight members as required under Section 1.1(b), however, the Stockholder Agreement imposed no further requirements concerning the size of the Board. It neither specified when nor prescribed under what circumstances the Board may or must expand beyond eight directors.[35]

Because the Stockholder Agreement does not expressly prohibit a Board of more than eight directors, Plaintiff argues that the Stockholder Agreement operates to effectively cap the number of directors at eight. Plaintiff relies on Section 1.1(c) of the Stockholder Agreement, which grants Brookfield the right to "designate for nomination the higher of 37.5% of the total number of directors *or* three (3) directors (each, a 'Designated Director')."[36] Plaintiff further relies on Section 1.1(f)(i), which provides that GrafTech must "cause the total number of directors constituting the Board to be fixed at a number sufficient to permit such persons to be added as members of the Board."[37] Plaintiff argues that Section 1.1(f)(i) means the Board either *must* be "fixed at eight members so that

---

[33] S'holder Agr. art. I, § 1.1(a) ("[T]he total number of directors constituting the [Board] [is] to be fixed at seven (7) directors as of the IPO Closing[.]").

[34] *Id.* § 1.1(b) ("On or before the first anniversary of the IPO Closing, … the total number of directors constituting the Board [shall] be increased by one (1) director to a total of eight (8) directors[.]").

[35] *See id.* art. I, § 1.1.

[36] *Id.* art. I, § 1.1(c) (emphasis added).

[37] Am. Compl. ¶ 135; S'holder Agr. art. I, § 1.1(f)(i).

13

Brookfield could nominate *exactly* 37.5%, or three members" or must "expand to a size large enough to allow Brookfield to nominate exactly 37.5%, which requires at least sixteen members (i.e., 37.5% x 16 = 6)."[38]  Plaintiff maintains that since the Certificate caps the Board size at eleven, a Board of eight is the only alternative.[39]

Plaintiff's interpretation of Section 1.1(c) is contrary to the plain language of the Stockholder Agreement.  Plaintiff's interpretation would have the court supplant the phrase "the higher of" with the word "exactly."  That is, Plaintiff contends that the number of Brookfield-designated directors must be "exactly" 37.5%.  Yet, if that were the case, then there would be no need for Section 1.1(c) to include language specifying "the higher of" 37.5% of the Board "or" three directors.[40]  The "higher of" language in Section 1.1(c) is given effect only if there are nine or more directors.  Plaintiff's interpretation violates a fundamental principle of Delaware contract law by making the words of Section 1.1(c) surplusage.[41]

---

[38] Am. Compl. ¶ 135 (emphasis added); *see also id.* ¶ 26.

[39] *Id.* ¶ 135.

[40] S'holder Agr. art. I, § 1.1(c).

[41] *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 741 n.69 (Del. Ch. 2008) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable.  A court will interpret a contract in a manner that gives reasonable meaning to all of its provisions, if possible.") (quoting 11 Williston on Contracts § 32:5 (4th ed.) (internal quotations omitted)).

Because the Stockholder Agreement does not expressly or impliedly set the exact number of directors once the Board reached eight members as required under Section 1.1(b), the default provisions of the Certificate apply, and the Board had the ability to determine the exact number of directors.

### 2. The Stockholder Agreement Did Not Require Brookfield To Fill The Ninth Board Seat With A Designated Director.

Plaintiff alternatively contends that Brookfield was required to fill the vacant ninth seat with a Designated Director, not an Independent Director, and that Brookfield's failure to do so renders the appointment void.[42]  Setting aside the oddity of a minority stockholder

---

[42] "Independent Director" is a capitalized term defined in the Stockholder Agreement by reference to stock exchange rules and federal securities laws and not Delaware law. S'holder Agr. art. IV, § 4.1.  When referring to the contractual provisions, this decision uses the capitalized terms.  Lowercase "independence" in this decision refers to the principle under Delaware law "that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."  *See Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review.  *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814).  The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary.  746 A.2d at 253–54.  The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review.  Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

arguing that directors should not create a supermajority independent board,[43] Plaintiff's argument again founders on the plain language of the documents on which Plaintiff relies.

The governing provision of the Stockholder Agreement is, again, Section 1.1(c), which grants Brookfield the right to nominate "*the higher of* 37.5% of the total number of directors or three (3) directors" when it owns at least 25% of GrafTech stock.[44] The math called for under Section 1.1(c) does not clearly entitle Brookfield to a fourth director until the Board expands to eleven directors (37.5% of 11 = 4.125). The provision does not instruct what to do when 37.5% of the total number of directors includes fractions of people, such as when the Board comprises nine directors (37.5% of 9 = 3.375) or ten directors (37.5% of 10 = 3.75). Plainly, Brookfield cannot nominate fractions of people.

Plaintiff proposed a Brookfield-friendly solution, asking this court to round up the result in Brookfield's favor when 37.5% equals more than three but less than four, such that Brookfield is entitled to appoint a fourth director. Because Brookfield was entitled to nominate 3.375 directors under a nine-person Board configuration, Plaintiff's interpretation requires rounding up to allow Brookfield to nominate a fourth director.[45] Plaintiff's interpretation finds no support in conventional mathematic principles, which

---

[43] After all, Delaware law presumes that independent directors enhance the value of the firm and benefit minority stockholders. *See, e.g.*, *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1183–84 (Del. 2015) (stating that "[o]ur common law of corporations has rightly emphasized the need for independent directors to be willing to say no to interested transactions proposed by controlling stockholders" for the benefit of minority stockholders).

[44] S'holder Agr. art. I, § 1.1(c) (emphasis added).

[45] Am. Compl. ¶¶ 25, 134.

instruct that one does not round up to the nearest whole number unless the first number to the right of the decimal point is five or higher.[46] And Plaintiff provides no legal support for this controller-friendly interpretation.

Even if the court were to accept Plaintiff's unusual interpretation, Plaintiff's argument fails because the language in Section 1.1(c) is permissive and not mandatory. That is, even if the Stockholder Agreement granted Brookfield the right to nominate the ninth director, it did not require Brookfield to do so. Many provisions of the Stockholder Agreement use mandatory language requiring certain conduct.[47] By contrast, Section 1.1(c) provides only that Brookfield "shall have *the right*" to nominate a director.[48] This language imposes no basis for saddling Brookfield with an obligation to nominate a

---

[46] Columbia Center for New Media Teaching and Learning, *Frontiers of Science: Scientific Habits of Mind*, Chapter 5: Lies, Damned Lies and Statistics, Annotation, https://ccnmtl. columbia.edu/projects/mmt/frontiers/web/chapter_5/6664.html (noting that under the formal mathematical definition of rounding, "[i]f the digit to the right of the last digit you want to keep . . . is less than 5, then drop it (and everything to its right.) The value left behind is your rounded value.").

[47] *See* S'holder Agr. art. I, §§ 1.1(a) ("[Board] members . . . *shall be elected* for staggered three-year terms"), 1.1(b) ("the Board *shall take all Necessary Action* to . . ."), 1.1(c) ("the Approved Holders *shall promptly cause* all Designated Directors to promptly tender their resignations"), 1.1(d) ("the Board *shall recommend* that one (1) such designee be included in the slate of nominees"), 1.1(f)(ii) ("the Board *shall appoint* one (1) Designated Director as a member of each committee"), 1.1(f)(iii) ("the Board *shall not delegate* the general powers of the Board to any committee . . . ") (emphases added).

[48] *Id.* art. I, § 1.1(c) (emphasis added).

director.[49]  Brookfield's determination not to exercise that right does not constitute a breach of contract by Brookfield or a basis for invalidating Dunn's appointment.

### 3. It Is Not Reasonably Conceivable That The Directors Breached Their Fiduciary Duties By Filling The Vacant Seat With An Indisputably Independent Director.

Finally, Plaintiff attacks Count III by asserting that Dunn's appointment to the Board was a breach of fiduciary duty because it was "an invalid sham" to insulate the Board from potential liability stemming from the Challenged Transactions.[50]  In support of this argument, Plaintiff points to the fact that Dunn's appointment happened after Plaintiff made a Section 220 demand but before Plaintiff filed this litigation.[51]  Specifically, Plaintiff made a Section 220 demand in February 2020.  In August 2020, Dunn was appointed to the Board.  Plaintiff filed this litigation in September 2020.  Plaintiff argues that because a majority of the Board was interested prior to Dunn's appointment, it is reasonably conceivable that Dunn's appointment was for the purpose of countering a demand futility argument and thus motivated by self-interest.

To state a claim against Defendants in the face of an exculpatory charter provision, Plaintiff must allege facts from which the court can reasonably conclude that Dunn's appointment was a breach of the duty of loyalty.[52]  The only fact to which Plaintiff points

---

[49] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 364 (Del. 2013) (declining to read a provision as mandatory because the "[contract] drafters knew how to impose an affirmative obligation when they so intended").

[50] Am. Compl. ¶ 139.

[51] *Id.* ¶ 118; Pl.'s Ans. Br. at 20.

[52] *Cornerstone*, 115 A.3d at 1179–80 (noting that a plaintiff seeking to assert a claim against a director protected by an exculpatory provision must plead "facts supporting a

18

is the timing of Dunn's appointment—seven months after Plaintiff served a demand to inspect books and records.[53] Plaintiff does not cite to a single case where this court, or any court, has found such an allegation sufficient to support a claim for breach of fiduciary duty. Standing alone, a seven-month interlude between a Section 220 demand and the appointment of an additional, independent director, does not render it reasonably conceivable that the directors breached their fiduciary duties by appointing a concededly independent director to the Board.

Moreover, Plaintiff's approach would expose directors to potential liability, for some unstated period of time, for expanding or otherwise changing the Board composition to increase its independence from an interested party after receipt of a Section 220 demand. Section 220 demands are increasingly common, and Delaware law encourages stockholders to pursue books and records actions in certain circumstances.[54] Changes in

---

rational inference that the director harbored self-interest adverse to the stockholders' interests . . . or acted in bad faith."); *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 256 (Del. Ch. 2021) ("a complaint . . . must allege facts that support a reasonable inference of a divergent interest, regardless of the source, that rises to the level of a disabling conflict.").

[53] Am. Compl. ¶¶ 20, 35, 118; Pl.'s Ans. Br. at 20.

[54] *See* Roy Shapira, *Corporate Law, Retooled: How Books and Records Revamped Judicial Oversight*, 42 CARDOZO L. REV. 1949, 1954 (2021) ("Section 220 actions have increased thirteenfold from 1981–1994 to 2004–2018") (citing James D. Cox et al., *The Paradox of Delaware's "Tools at Hand" Doctrine: An Empirical Investigation*, 75 BUS. LAW. 2123, 2130 (2020)); Edward B. Micheletti et al., *Recent Trends in Books-and-Records Litigation*, DEL. LAW., Winter 2020, at 18 (2020) (noting that "stockholder demands to inspect corporate books and records has increased, and, in turn, the case law concerning Section 220 demands is rapidly developing"); *AmerisourceBergen Corp. v. Lebanon Cnty. Empls.' Ret. Fund*, 243 A.3d 417, 426 (Del. 2020) (stating that "[f]or over a quarter-century, this Court has repeatedly encouraged stockholders suspicious of a corporation's management

Board composition too are common occurrences,[55] and changes in Board composition can often achieve salutary goals.[56] Plaintiff's approach would place these two common occurrences, which Delaware law often encourages, in tension with one another.

For these reasons, the mere appointment of an additional independent director seven months following receipt of a Section 220 demand does not support a claim for breach of fiduciary duty.

## B.    Demand Is Not Excused As To Count II.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[57] "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[58] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they

---

or operations to exercise this right to obtain the information necessary to meet the particularization requirements that are applicable in derivative litigation").

[55] *See United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 889 (Del. Ch. 2020) (observing that "[c]hanges in board composition are common").

[56] *See, e.g.*, Theodore N. Mirvis et al., *The Dangers of Independent Directors*, 40 DEL. J. CORP. L. 481, 481 (2016) (noting that in 1987 only 34% of major publicly held corporations had 3 or more independent directors and that by 2014 that figure increased to 94%); Julie Hembrock et al., *2021 U.S. Board Index*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Nov. 13, 2021), https://corpgov.law.harvard.edu/2021/11/13/2021-u-s-board-index/ (noting that representation of historically underrepresented groups on boards increased from 31% of incoming directors in 2011 to 72% in 2021, and that representation of women increased from 16% to 43% over the same period).

[57] *Aronson*, 473 A.2d at 811 (citing 8 *Del. C.* § 141(a)).

[58] *Zuckerberg*, 250 A.3d at 876.

wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[59] The demand requirement is a substantive principle under Delaware law.[60] Rule 23.1 is the "procedural embodiment of this substantive principle."[61]

Under Rule 23.1, stockholder plaintiffs must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[62] Stockholders choosing to allege demand futility must meet "heightened pleading requirements,"[63] alleging "particularized factual statements that are essential to the claim."[64] "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."[65]

Recently, the Delaware Supreme Court affirmed *Zuckerberg* and thereby adopted Vice Chancellor Laster's "universal test" for demand futility that blends elements of the

---

[59] *Id.*

[60] *Id.*; *see* Ct. Ch. R. 23.1(a).

[61] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[62] Ct. Ch. R. 23.1(a).

[63] *Zuckerberg*, 250 A.3d at 876.

[64] *Brehm*, 746 A.2d at 254.

[65] *Id.* at 255.

21

two precursor tests: *Aronson v. Lewis*[66] and *Rales v. Blasband*.[67]   When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[68]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[69]   While the *Zuckerberg* test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[70]

This court evaluates demand futility on a director-by-director basis, determining whether a majority of the board of directors could consider a demand by "count[ing] heads."[71]   Of the nine-member Board, one is the Company's CEO, Rintoul, and three

---

[66] 473 A.2d 805 (Del. 1984).

[67] 634 A.2d 927 (Del. 1993).

[68] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[69] *Id.*

[70] *Id.*

[71] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016).

directors are affiliated with Brookfield. For the purposes of Plaintiff's Rule 23.1 motion, Defendants do not dispute that these directors are compromised. Thus, to avoid dismissal, Plaintiff must plead particularized facts supporting a reason to doubt that at least one of the five outside directors is incapable of exercising disinterested and independent judgment regarding a demand. Recall that the five outside directors are Clegg, Dunn, Acton, Dumas, and Taccone. Plaintiff failed to adequately allege that any of these five directors are incapable of disinterestedly and independently considering a demand.

### 1. No Outside Director Received A Material Personal Benefit From The Alleged Misconduct.

Plaintiff failed to plead that any of the five outside directors stood to gain a material personal benefit from the Challenged Transactions. Consequently, the answer to the first *Zuckerberg* inquiry is "no" as to all five outside directors.

### 2. No Outside Director Faces A Substantial Likelihood Of Liability.

"[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors."[72] A plaintiff must plead a substantial likelihood of liability for the threat to give rise to a reasonable doubt as to a director's ability to impartially consider a demand.[73] Where, as here, the directors are protected from liability by an exculpatory charter provision adopted pursuant to 8 *Del. C.* § 102(b)(7), "a substantial likelihood of liability

---

[72] *Rales*, 634 A.2d at 936.

[73] *Id.* (citing *Aronson*, 473 A.2d at 815).

23

may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts."[74] Whether a director faces a substantial likelihood of liability from a non-exculpated claim "turns primarily on . . . whether the complaint pleads particularized facts that support a reasonable inference that the director's decision could be attributed to bad faith."[75]

Plaintiff has not demonstrated that Clegg, Dunn, or Acton face a substantially likelihood of liability. Generally, a director must be involved in a challenged Board decision for that decision to give rise to liability.[76] Dunn joined the Board after the Share Repurchase was approved. The Audit Committee approved the Share Repurchase, and Clegg was not a member of the Audit Committee.[77] Although Acton was a member of the

---

[74] *Zuckerberg*, 250 A.3d at 888 n.18; s*ee also In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *12 (Del. Ch. Jan. 11, 2010) ("Only an 'utter failure' will satisfy a showing of bad faith.").

[75] *Zuckerberg*, 250 A.3d at 890; *see also Owens v. Mayleben*, 2020 WL 748023, at *7 (Del. Ch. Feb. 13, 2020), *aff'd*, 2020 WL 6373169 (Del. Oct. 29, 2020, corrected Nov. 18, 2020).

[76] *See, e.g.*, *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at *2 (Del. Ch. Mar. 9, 1995) (observing that "a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve the transaction was wrongful"); *Zuckerberg*, 250 A.3d at 894 (holding that a director was disinterested where, among other things, the director joined the board after the challenged transaction had been approved).

[77] Plaintiff argues in briefing that Clegg faced a substantial likelihood of liability based on her participation in the December 3 Board decision to delegate authority to the Audit Committee. But, as discussed below, the Audit Committee members were independent from Brookfield. And Plaintiff cites no authority for the proposition that a director faces a substantial likelihood of liability in a challenge to a decision that the director agreed should be relegated to a committee of disinterested and independent directors. In any event, Plaintiff did not challenge Clegg's impartiality in the Complaint, and "a plaintiff cannot use her briefing to rewrite her complaint." *Morgan v. Cash*, 2010 WL 2803746, at *8 n.64

24

Audit Committee, he was not present when the committee approved the Share Repurchase or at the Board meeting that day.[78] Consequently, Clegg, Dunn, and Acton do not face a likelihood of liability under the second prong of the *Zuckerberg* analysis.

Dumas and Taccone are dissimilarly situated from the other Defendants because they were involved in the Audit Committee's decision. Still, Plaintiff has failed to meet his pleading burden as to these directors. Plaintiff argues that the Share Repurchase was not the product of an informed business judgment, but his allegations are insufficient to support an inference that either Dumas or Taccone acted in bad faith.

Plaintiff alleges that the process was defective because the decision was delegated to the Audit Committee and no special committee was formed. But Plaintiff has not pled facts sufficient to create a reasonable doubt that any of the Audit Committee members lacked independence from Brookfield as discussed below nor explained why a special committee would be required. Plaintiff chastises the Audit Committee's failure to hire legal and financial advisors concerning the Share Repurchase. But hiring advisors is not a mandatory requirement under Delaware law.[79] Plaintiff criticizes the Audit Committee's reliance on the Block Trade to establish the repurchase price. But the Block Trade was an

---

(Del. Ch. July 16, 2010); *see also McGowan v. Ferro*, 2002 WL 77712, at \*4 n.27 (Del. Ch. Jan. 11, 2002). Plaintiff's attempt to impugn Clegg's disinterest fails.

[78] Plaintiff argues that Acton's presence at the November 6, 2019 Board meeting suffices to implicate him. Even after giving every inference to the Plaintiff, however, it is not reasonable to conclude that Acton faces a substantial likelihood of liability for the Audit Committee's decision based solely on his knowledge of the forthcoming announcement of bad financial results.

[79] *See Wayfair Inc. v. Great Hill P'rs, L.P.*, 2021 WL 5492967, at \*5, \*10–11 (Del. Ch. Nov. 23, 2021).

arm's-length transaction between Brookfield and an investment bank, which resulted from a bidding process, and which involved a sophisticated third party with every incentive to pay as little as possible.[80] Therefore, Plaintiff's criticisms of the December 3 decision are insufficient to call into question the good faith of Dumas or Taccone.

For this reason, Plaintiff places the December 3 decision in greater context, arguing that the timeline bears on the directors' good faith. Plaintiff theorizes that the Share Repurchase was timed to cause the Company to overpay because, on November 6, the Board learned of the Company's disappointing 2019 fiscal year financial results, and the Share Repurchase occurred before the Company publicly reported those results. Plaintiff further alleges that the Board and Audit Committee rushed the process at Brookfield's request after reconsidering the Share Repurchase during the November 27 meeting.

Certainly, the timing of a board decision can shed light on a fiduciary's subjective intent. In *Ryan v. Gifford*, for example, this court found that directors faced a substantial

---

[80] *See S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *18 (Del. Ch. Mar. 9, 2011) ("real world valuations, including especially, valuations performed by potential third-party buyers" verify valuation methodologies), *aff'd*, 35 A.3d 419 (Del. 2011); *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 367 n.104 (Del. 2017) ("The best evidence of value, if available, is third-party sales value.") (quotation omitted). Plaintiff argues that Morgan Stanley was conflicted with respect to the Block Trade. Pl.'s Ans. Br. at 64–65. As support, Plaintiff points to "a series of market transactions" between Brookfield and Morgan Stanley. Am. Compl. ¶ 74. These allegations, however, are wholly conclusory. Given Morgan Stanley's status as an investment bank, it is not reasonable to conclude that a series of unrelated market transactions call into question Morgan Stanley's independence from Brookfield. *See In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011) (no reasonable doubt as to the independence of the director alleged to be beholden to Goldman).

26

likelihood of liability based on the board's timing of nine backdated stock options over a six-year period when coupled with empirical data showing that the backdated options outperformed the market by nearly ten times.[81] Chancellor Chandler reasoned that, "[t]his timing, by my judgment and by support of empirical data, seems too fortuitous to be mere coincidence."[82] But the singular, ostensibly suspicious timing issue alleged here fails to rise to the sort of allegations in *Ryan*.

It is also true that directors' conduct in the process leading to a challenged transaction can shed light on their relationship with the counterparty. For example, Plaintiff cites to *In re CBS Corp. Shareholder Class Action & Derivative Litigation*, where the court held that the directors faced a substantial likelihood of liability because they "assent[ed]" to the controlling party's wishes without protest, which "evidenced their inability to push back against the asserted will of the controller."[83] But the court in *CBS* reached this conclusion in the face of particularly egregious facts, where controller-selected directors approved a merger with the controller after several previous failed merger attempts and after the board had repeatedly been advised that the merger was unfavorable.[84] Plaintiff's allegations here bear no resemblance to the unusual facts of *CBS*.

---

[81] 918 A.2d 341, 354–56 (Del. Ch. 2007).

[82] *Id.* at 354–55.

[83] 2021 WL 268779, at *41 (Del. Ch. Jan. 27, 2021).

[84] *Id.*

Plaintiff further argues that the Share Repurchase was designed to minimize any reductions in Brookfield's voting power at the expense of minority stockholders.[85] Plaintiff complains that Brookfield's pre-Share Repurchase interest of 79.2% would have been reduced to 68.8% if Brookfield was required to sell those shares on the open market, as opposed to the 73.6% interest Brookfield maintained following the Share Repurchase.[86] Because Brookfield could accomplish the same actions through the stockholder franchise at either 68.8% or 73.6% interest, it is difficult to conclude that the Board acted to preserve Brookfield's incremental voting power.

At a high level, Plaintiff's allegations simply register disagreement with the Share Repurchase, but mere disagreement does not give rise to a substantial likelihood of liability for disloyalty or bad faith.[87] Plaintiff's allegations, "at most, allege a breach of the duty of care," for which Dumas and Taccone do not face any threat of liability.[88] Consequently, Plaintiff has failed to plead facts showing that any outside director faces a substantial likelihood of liability.

---

[85] Am. Compl. ¶ 124.

[86] *Id.*

[87] *See, e.g.*, *Zuckerberg*, 250 A.3d at 897 ("The plaintiff disagrees with how the Committee proceeded, but those disagreements are not sufficient to support an inference of bad faith.").

[88] *See Zuckerberg*, 250 A.3d at 900 (dismissing complaint that "does not plead particularized facts to suggest that the Committee extracted so little value from [the controlling stockholder] that its members could be found to have acted in bad faith"); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *24 (Del. Ch. Oct. 24, 2014) (finding it not "reasonably conceivable that Plaintiffs could show that the merger price so exceeded the bounds of reason as to make it explainable only by bad faith").

### 3. No Outside Director Lacks Independence.

Rebutting the presumption of director independence in the demand futility context requires "facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[89] Delaware law "requires that all the pled facts regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence."[90] In making the independence determination, the Court must "consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other."[91]

Plaintiff does not challenge Acton, Clegg, or Dunn's independence. Although Plaintiff asserts in briefing that "Taccone, Dumas, Acton, and Clegg . . . are not independent,"[92] Plaintiff discusses the independence of Dumas and Taccone only. Plaintiff thus waived arguments as to the other outside directors by failing to brief them.[93]

---

[89] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (quoting *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015)).

[90] *Sanchez*, 124 A.3d at 1022.

[91] *Id.* at 1019; *Ezcorp*, 2016 WL 301245, at *34.

[92] Pl.'s Ans. Br. at 47.

[93] *In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017) (holding that issues not addressed in an answering brief are waived) (citing *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007)).

Plaintiff alleges that Dumas lacks independence due to his relationship with Brookfield-affiliated director Turcotte and also because the GrafTech director fees are material to him.

As to the relationship with Turcotte, Plaintiff alleges that "Dumas was Tembec Inc.'s Executive Vice President and Chief Financial Officer between 1997 and 2017" and "Turcotte was Tembec's Executive Vice President of Corporate Development and Strategy from 1992 to 2002."[94] The reasonable inference from the pled facts is that Dumas and Turcotte worked as fellow executives at the same company for five years.

Generally, "[t]he naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."[95] "In order to establish lack of independence, the complaint must create a reasonable doubt that a director is so beholden to an interested director that his or her discretion would be sterilized."[96] "[T]he heightened strength of relationship required to" show that business relationships raise a reasonable doubt as to a director's independence "renders allegations concerning most ordinary relationships of limited value, at most."[97]

---

[94] Am. Compl. ¶ 17.

[95] *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002); *Owens*, 2020 WL 748023, at *11 (same); *Jacobs v. Yang*, 2004 WL 1728521, at *7 n.33 (Del. Ch. Aug. 2, 2004) (same); *see also Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (holding that serving with a director on an unaffiliated company's board was insufficient to cast a reasonable doubt on the defendant's independence from that director).

[96] *Highland Legacy*, 2006 LW 741939, at *5.

[97] *Khanna v. McMinn*, 2006 WL 1388744, at *16 (Del. Ch. May 9, 2006).

Here, Plaintiff's allegations concerning Dumas and Turcotte's relationship fails to achieve that "heightened strength" needed to matter. This court has found more significant business relationships of longer duration insufficient to impugn a director's independence in the context of a Rule 23.1 analysis.[98] Compared to precedent, Dumas's five-year overlap with Turcotte at Tembec, which ended 18 years before this litigation, is insufficient to create a reasonable doubt as to Dumas's independence from Brookfield on a Rule 23.1 motion.[99]

---

[98] *See, e.g., Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980–81 (Del. Ch. 2000) (holding that a 15-year professional relationship, alone, was insufficient to cast reasonable doubt upon a director's independence); *In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at *24 (Del. Ch. Sept. 30, 2020) (holding that a 20-year term of employment with the company's largest stockholder failed to raise a reasonable doubt as to the director's independence because the employment ended over three years before litigation commenced and plaintiff did not show any facts supporting an inference that a "significant relationship" existed between the director and the company's largest stockholder); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 2015 WL 4192107, at *11 (Del. Ch. July 13, 2015) (holding that a 16-year term of employment with the controlling stockholder failed to raise a reasonable doubt as to the director's independence because plaintiff did not show how an employment relationship that ended three years earlier represented a disabling conflict).

[99] Plaintiff further alleges that Turcotte "hand-picked" Dumas to serve on the Board. Am. Compl. ¶ 109. Yet, because "[d]irectors must be nominated and elected to the board in one fashion or another," to hold a director beholden to one who nominated her "would unnecessarily subject the independence of many corporate directors to doubt." *Khanna*, 2006 WL 1388744, at *15; *see also McElrath v. Kalanick*, 224 A.3d 982, 995 (Del. 2020) (holding that nomination or election by a controlling stockholder was "insufficient by itself to reasonably doubt a director's independence because '[t]hat is the usual way a person becomes a corporate director'"). In this case, the fact that Turcotte selected Dumas to join the Board does not impugn Dumas's independence from Brookfield.

As to the director fees, Plaintiff alleges that Dumas is retired and GrafTech has been his only form of employment since 2017. Dumas receives $140,000 a year in cash and stock for his service as a director.

Generally, serving as a director on the board of a Delaware corporation is not a pro bono gig; Delaware law recognizes that directors will be paid a fair and reasonable amount. For that reason, when director fees are not excessive, mere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence.[100]

Here, the amount of director fees paid is not unusually excessive.[101] The fact that Dumas is retired and the director position is his sole source of current employment does not give rise to a reasonable inference that his GrafTech fees are material to him. The director fees are thus insufficient to call into question Dumas's independence.

Plaintiff's allegations as to Dumas fail to raise a reasonable doubt as to his independence from Brookfield.

Plaintiff alleges that Taccone lacks independence because of his co-ownership of a consulting firm, First River, LLC ("First River"), which has done some work for Brookfield and GrafTech, and because his GrafTech director fees are material to him.

---

[100] *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 360 (Del. Ch. 1998), *aff'd in part sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[101] *See* Matthew Friestedt et al., *Trends in U.S. Director Compensation*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Aug. 16, 2020), https://corpgov.law.harvard.edu/2020/08/16/trends-in-u-s-director-compensation/ ("The total mean compensation for [directors of] Russell 3000 companies was $167,013, based on 2019 disclosure documents.").

As to First River's relationship with GrafTech, Plaintiff alleges the following:

- Brookfield paid First River $25,000 for consulting work completed between December 2019 and January 2020, Brookfield paid First River an unspecified amount of money for helping Brookfield evaluate the acquisition of GrafTech in 2015, and that Brookfield has been a client since at least 2015.[102]

- GrafTech paid First River $30,000 in 2019 and $20,000 in 2020 for subscriptions to First River's data on the steel industry.[103]

- Taccone "does other 'occasional' work for Brookfield" comparable to the $25,000 consulting job in December 2019 and January 2020.[104]

The amounts paid to First River, on their face, do not raise concerns regarding Taccone's independence from Brookfield. This court has found similar consulting fees insufficient to raise a reasonable doubt as to a director's independence.[105]

To portray these relatively small consulting fees as problematic, Plaintiff argues that they are disproportionately large when compared against Taccone's other income and assets and thus material to Taccone. For this point, Plaintiff relies on a public loan

---

[102] Am. Compl. ¶¶ 111–12.

[103] *Id.* ¶ 113.

[104] *Id.* ¶¶ 114–15. Plaintiff also alleges First River *expects* to receive subscription and consulting fees from Brookfield or GrafTech in the future, but such allegations are wholly conclusory and need not be accepted as true.

[105] *See, e.g.*, *In re Ply Gem Indus., Inc. S'holder Litig.*, 2001 WL 755133, at *9 (Del. Ch. June 26, 2001) (finding that receipt of $25,000 in annual consulting fees did not support a reason to doubt a director's independence whereas receipt of annual consulting fees of $91,000 did create a reasonable doubt as to the director's independence); *Merchs.' Nat. Props., Inc. v. Meyerson*, 2000 WL 1041229, at *6 (Del. Ch. July 24, 2000) (finding that receipt of $30,000 in consulting fees did not raise a reasonable doubt as to director's independence); *Walt Disney*, 731 A.2d at 360 (finding that receipt of $50,000 in consulting fees did not raise a reasonable doubt as to a director who was a nationally known legal and political figure); *see also Voigt v. Metcalf*, 2020 WL 614999, at *15 n.14 (Del. Ch. Feb. 10, 2020) (collecting cases on materiality of consulting fees).

application and a zoominfo report. Plaintiff interprets the loan application to mean that Taccone receives a salary from his primary employment of approximately $140,000. But Plaintiff presents a strained reading of the loan application, which was submitted for a limited purpose and did not require complete financial reporting.[106] Plaintiff interprets the zoominfo report as representing that First River's revenue is $392,000 a year and attributes roughly half of that to Taccone as income. But there are several glaring problems with the zoominfo report. For example, the same report identifies roughly $200,000 in revenue for Q2 2020 but over $1 million in revenue for Q3 2019, Q4 2019, and Q1 2020.

While recognizing that all reasonable inferences must be made in favor of the Plaintiff at the pleading stage, the paucity of information presented by the loan application and demonstrated unreliability of the zoominfo reports forecloses their use even under the plaintiff-friendly standard. Given this, it is not reasonable to rely on the income and revenue figures Plaintiff identified.

As to his director fees, Plaintiff alleges that Taccone receives $125,000 in cash and stock compensation. The $125,000 paid to Taccone is less than the $140,000 paid to Dumas that this decision already blessed. Plaintiff argues that this amount of fees is

---

[106] Plaintiff surmises that Taccone receives a salary of $140,000 from First River based on assumptions derived from a Paycheck Protection Program ("PPP") loan of $57,800, but under the PPP, a borrower can only seek forgiveness for up to $100,000 in compensation per employee, thus it is unreasonable to assume that, based on the PPP loan by itself, Taccone was paid $140,000 annually from First River. The PPP also covers nonpayroll costs such as business mortgages, rent, and utility payments, which further undercuts Plaintiff's assumption. Plaintiff further assumes that Taccone's assets are worth less than $350,000 based on the results of a public search but provides no confidence concerning the thoroughness of a "public search."

material to Taccone when compared to Taccone's income and assets, but Plaintiff's allegations concerning Taccone's income and assets are no more than mere conjecture for the reasons discussed above.

Plaintiff's allegations as to Taccone fail to raise a reasonable doubt as to his independence from Brookfield.

## III. CONCLUSION

In summary, the expansion of the Board from eight to nine seats and the appointment of Dunn as an independent director were valid. No outside director received a material personal benefit from the Challenged Transactions. No outside director faces a substantial likelihood of personal liability from the Challenged Transactions. No outside director lacks independence from Brookfield. All five of GrafTech's outside directors were thus capable of independently and disinterestedly considering a pre-suit demand. Demand is therefore not excused as futile. Defendants' motions to dismiss are GRANTED.